**CEDAR CREST HATS, INC., et al., Appellants,**

v.

**UNITED HATTERS, CAP AND MILLINERY WORKERS INTERNATIONAL UNION, AFL–CIO, Appellee.**

No. 21590.

United States Court of Appeals
Fifth Circuit.

June 16, 1966.

**324**

Emil Corenbleth, Harold B. Berman, Dallas, Tex., for appellants.

Charles J. Morris, David R. Richards, Mullinax, Wells, Morris & Mauzy, Dallas, Tex., for appellee, Mullinax, Wells, Morris & Mauzy, Dallas, Tex., of counsel.

Before JONES, Senior Judge,[*] and GEWIN and BELL, Circuit Judges.

GEWIN, Circuit Judge.

This is an appeal from a judgment rendered for the Union defendant in the United States District Court for the Northern District of Texas in a suit seeking an injunction and damages for alleged antitrust violations and illegal labor practices.

Appellee, United Hatters, Cap and Millinery Workers International Union, AFL–CIO (Union), is a labor organization representing ladies' hat and millinery workers throughout the United States. Until the time of the institution of this lawsuit, it had been unsuccessful in attempts to organize the workers of millinery manufacturers in the Dallas, Texas, area, except in the plant of one Bierner & Son.

In 1962, the Union began a nationwide membership and public education drive. It was the stated goal of the Union to condition the hat-wearing public to buy only those hats bearing union labels so that all manufacturers would be forced to unionize. The Union contacted a number of national retailers of ladies' hats and stated that if they continued to buy and retail non-union goods, it would distribute leaflets in front of their stores urging customers to buy only union-made hats. One such retailer, Joseph Rabinovich, owner of Ogus, Rabinovich & Ogus, Inc. (ORO) and Rhealee Stores, Inc. (Rhealee), acquiesced in Union demands and instructed the personnel in his two companies to stop purchasing from nonunion shops when buying in the Dallas market. There was no labor dispute between Rabinovich and the Union, as ORO and Rhealee had already unionized their shipping and handling departments.

Soon thereafter, nine non-union millinery manufacturers[1] in Dallas (appellants) became cognizant of the Union pressure on retailers and filed suit in the district court, seeking an injunction and damages against the Union, ORO and Rhealee. Four counts in the complaint alleged:

I. A conspiracy between the Union, and ORO and Rhealee to restrain inter-

---

[*] Of the United States Court of Claims, sitting by designation.

1. Texas Millinery Company; Sue Ellen Hat Co., Inc.; Cedar Crest Hats, Inc.; Parke Layne Hats; Jan Leslie Hats, Inc.; Goldstein Hat Manufacturing Company; Pete Brooks Hat Company, Inc.; Bernstein Millinery Company; and Frank M. Benson.

state trade or commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A., SS 1 and 2.

II. A common law conspiracy between the same parties to damage the business of appellants without justification and with malice.

III. Violation of the secondary boycott provisions of the Labor Management Relations Act, 29 U.S.C.A. § 158 (b) (4) (ii) (B).[2]

IV. A common law action for unlawful and malicious interference with the business relationships of the manufacturers and their customers.

The Union denied each of the allegations. Prior to the trial, ORO and Rhealee were dismissed from the case with consent of appellants.

Upon the trial special issues were submitted to a jury, pursuant to Rule 49(a) F.R.Civ.P. As to Count III, the District Court denied appellants' request to submit to the jury the question of whether there existed a "labor dispute" between appellants and the Union as defined in 29 U.S.C.A. § 113 (Norris-LaGuardia Act.)

The jury found for appellants on Count I and for the Union on Counts II, III and IV. Both parties made motions for judgment notwithstanding the verdict under Rule 50 F.R.Civ.P. The District Court granted the Union's motion and entered judgment for it notwithstanding the jury verdict on Count I. Texas Millinery Co. v. United Hatters, etc., 229 F.Supp. 341. This appeal followed.[3]

Appellants here contend the District Court erred as follows: (1) in granting judgment for the Union notwithstanding the verdict of the jury on Count I because there was sufficient evidence to support the verdict; (2) by refusing to submit to the jury under Count III the question of whether there existed a "labor dispute" between appellants and the Union as defined by 29 U.S.C.A. § 113; and (3) the verdict of the jury on Count III was contrary to a preponderance of the evidence and therefore, their motion for judgment notwithstanding the verdict shoud have been granted.

■ The answer to appellants' first contention can be found in the Court's charge to the jury on union antitrust violation, the pertinent portion of which is as follows:

"The antitrust law seeks to maintain free competition in interstate commerce in order to protect the public interest. The end sought by the antitrust law is the prevention of unreasonable restraints in business and commercial transactions which tend to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services; the public is to be protected in order to secure to them the advantages which accrue to them from free competition in the market. A concerted refusal to deal, which tends to restrict free and open access to the market is a restraint of trade, since it is one of those situations where the law presumes a public injury. You must decide under the evidence whether any refusal to deal here is a restraint of trade. Not all restraints of trade are unreasonable restraints. All business action affects trade in some way. Therefore, in determining whether a restraint of trade exists, you must decide whether the particular conduct is reasonably calculated to prejudice the public interest, which the antitrust law is designed to protect; that is, you must decide whether the conduct which you have found tends to restrict or otherwise control free and

2. The District Court concluded it had jurisdiction under the provisions of 29 U.S.C.A. § 187(b).

3. By order of this Court five of the appellants were voluntarily dismissed from the appeal: Texas Millinery Co.; Sue Ellen Hat Co., Inc.; Jan Leslie Hats, Inc.; Pete Brooks Hat Co., Inc.; and Bernstein Millinery Co. As to the four appellants remaining, the jury found damages in the following amounts:

| | |
|---|---|
| Cedar Crest Hats Inc. | $ 501.00 |
| Park Layne Hats | $ 681.00 |
| Goldstein Hat Mfg. Co. | $2,201.00 |
| Frank M. Benson | $ 621.00 |

open competition. In determining whether or not such an unreasonable restraint exists, you need not find a specific public injury, but you must find that the conduct tends or is reasonably calculated to prejudice the public interest."

■■ We find this charge to be inadequate to describe a *labor union* antitrust violation, because it merely defines an antitrust violation in the broadest possible terms without giving any consideration to the special exemptions which labor unions enjoy under the law. Our reading of the Supreme Court decisions in Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), and the more recent cases of United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) and Local Union No. 189, Amalgamated Meat Cutters, etc. v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), convinces us that in order for union activity to constitute a violation of antitrust laws in the circumstances here presented, there must be a combination of union and nonunion business groups to create a monopoly, resulting in a restraint of trade or interstate commerce.[4] For example, in *Bradley*, the union entered into a "program in which contractors and manufacturers united with one another to monopolize all the business in New York City, to bar all other business men from that area, and to charge the public prices above a competitive level." 325 U.S. 809, 65 S.Ct. 1540, 89 L.Ed. 1948. In *Pennington*, the Court said a violation would arise if the union were to become a party to a collusive arrangement among large coal producers designed to drive smaller competitors from the market, even though the union's part in the scheme was a bona fide undertaking to secure better wages for its members. 381 U.S. 663–666, 85 S.Ct. 1585, 14 L.Ed.2d 632–634. In other words, the union must join in a conspiracy *to create a monopoly among fellow-conspiratory business interests*. This interpretation is reinforced by the statement of Mr. Justice Black in Allen Bradley at 325 U.S. 809, 65 S.Ct. 1539, 89 L.Ed. 1948 that "Employers and the union did here make bargaining agreements in which the employers agreed not to buy goods manufactured by companies which did not employ the members of Local 3. *We may assume that such an agreement standing alone would not have violated the Sherman Act.*" (Emphasis added) *We*, in turn, may assume that where a union acts solely in its own self-interest and makes no attempt to create a monopoly, there is no antitrust violation.

The District Court seems to have recognized the error in its charge when it nullified the jury's verdict under Count I for the following reasons stated in its written findings:

"2. The purpose of the Union in advising Rabinovich of its intention to leaflet being to further legitimate union activity—that of unionizing employees of plaintiffs and promoting the sale of union-made goods and discouraging the sale of non-union-made goods —and there being no other purposes, the Union, in inducing O.R.O. and Rhealee to cease doing business with plaintiffs, acted solely in its self interest and with justification."

4. In *Bradley* the Court stated:
"The difficulty of drawing legislation primarily aimed at trusts and monopolies so that it could also be applied to labor organizations without impairing the collective bargaining and related rights of those organizations has been emphasized both by congressional and judicial attempts to draw lines between permissible and prohibited union activities. There is, however, one line which we can draw with assurance that we follow the congressional purpose. We know that Congress feared the concentrated power of business organizations to dominate markets and prices. It intended to outlaw business monopolies. A business monopoly is no less such because a union participates, and such participation is a violation of the [Sherman] Act."

"3. Rabinovich's agreement with Rose that O.R.O. and Rhealee would cease buying non-union goods does not violate the Sherman Act."

■■ For appellants to have prevailed under Count I it would have been necessary for them to prove facts showing that the Union conspired with certain business interests to create a monopoly for such business interests. We have diligently searched the record and conclude that no such facts were proved.

■ This case presents a rather unique situation. While there is substantial evidence to sustain the verdict of the jury under the erroneous charge, Count I should not have been submitted to the jury in the first place if the issue had been *properly stated*. Since the Union requested a directed verdict and such clearly would have been proper, the judgment of the District Court as to Count I is affirmed. Judgment notwithstanding the verdict may be entered "as if the requested verdict had been directed." Rule 50(b) F.R.Civ.P. It is our conclusion that in these circumstances the incorrect charge was "harmless error." Rule 61 F.R.Civ.P.

■ In Count III of their complaint appellants alleged a violation of the secondary boycott provisions of the Labor Management Relations Act, 29 U.S.C.A. § 158(b) (4) (ii) (B).[5] The Union responded by claiming that their leafletting activity was protected by the publicity proviso to that Section.[6] Appellants here complain that the District Court erred in refusing to submit to the jury the question whether there existed a "labor dispute" between themselves and the Union. 29 U.S.C.A. § 113(c) defines "labor dispute" as follows:

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

It is *quite* clear from the evidence that a "labor dispute" existed between appellants and the Union. Strong undisputed evidence shows that the Union has been attempting to organize millinery

5. § 158(b) (4) (ii) (B):
"(b) It shall be an unfair labor practice for a labor organization or its agents—
(4) (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;"

6. *"Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution."

workers in the Dallas area almost continuously since 1937. In 1957 the Union won a representation election from one manufacturer, Bierner & Son. As late as 1962 union representatives were obtaining authorization cards from appellants' employees, and only six months prior to the filing of this suit, a full-time organizer was stationed in Dallas who was in constant contact with millinery workers. No citation of authority is actually needed to hold this situation to be a "labor dispute," and the District Court is affirmed. See Marine Cooks & Stewards v. Panama Steamship, 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960); East Texas Motor Freight Lines v. International, etc., 163 F.2d 10 (5 Cir. 1947). Indeed, we find it unusual to say the least, that in these circumstances appellants would *deny* the existence of a labor dispute.

 Appellants concede that it would be lawful for the Union to leaflet the retail stores peacefully in order to advise the public of a labor dispute. However, they contend that a preponderance of the evidence shows that the *motive* of the Union was not to advise the public, but to effect a secondary boycott. Therefore, it is argued that the Union is not protected by the publicity proviso of Section 158(b) (4). We cannot agree to such a limited and unrealistic interpretation of that section. As the Supreme Court pointed out in N. L. R. B. v. Fruit & Vegetable Packers, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), the lawful purpose of leafletting a secondary distributor is to encourage the public to cease purchasing non-union goods and thus discourage the distributor from buying them. The only distinction between the *Fruit & Vegetable Packers* case and the present situation is that ORO and Rhealee acquiesced before the leafletting ever began. This was simply an act of foresight. The jury had abundant, undisputed evidence in the form of testimony from retailers themselves to conclude that the only pressure brought against them was the threat of leafletting. Therefore, the verdict and judg-

ment thereon shall stand. N. L. R. B. v. Fruit & Vegetable Packers, supra. See also N. L. R. B. v. Servette, Inc., 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964).

The judgment is affirmed.